When Mr. Lopez-Velasquez appeared before an immigration judge in February of 1994, he was neither eligible nor apparently eligible for any form of relief. Excuse me, it's not your fault, the mics are cutting out. Is there any way to move them I think when you're talking, you're in between them and when you look each direction, then we lose you on one and then it goes back to the other. So, is it best to just pass the mic? I think we're maybe okay, why don't you try it now. Maybe, I think it's these solid boxes that are cutting out. Why don't you go ahead and proceed, I think we'll be okay now. Thank you. When Mr. Lopez-Velasquez appeared before an immigration judge in February of 1994, he was neither eligible nor apparently eligible for any form of relief. Because of that fact, the immigration judge was under no obligation, either by rule, statute, or constitution, to advise him of any potential forms of relief. And because of that, Mr. Lopez-Velasquez's prior removal hearing was in fact fundamentally fair. The district judge in this case dismissed our indictment charging Mr. Lopez-Velasquez with illegal re-entry. Based upon his conclusion, the immigration judge should have informed him that if he had filed any sort of appeal, he would have accrued sufficient time during the appeal to then create eligibility. Yet, the standards that govern immigration judges have no such requirement. Well, let's, I guess from the standpoint, first off, under, is that the only theory that he could gain relief under? I mean, if you look at domicile at the time that he was, he was short, if you take it from the time he became an LPR. How much time was he short? Three years, nine months. All right, if it came, if you took the earlier date of domicile, which he tried, was he still short? If you took the temporary status date, he's still eight months short. All right, so the only way that he would then, if he had, if he filed an appeal, then that would be the only way to get that. And, but that being said, I guess this court found a due process violation for not advising the alien that there might be some way in the future, even though the law didn't exist at the time. That's great. That's what the panel originally held, was that Mr. Lopez Velasquez, because he could have come up with a colorable argument based on the fact that he had been working here for months or a couple of years, there's some discrepancy in the record about that. But because he had been working here prior to the time that he applied, that he might have a colorable argument that he, in fact, had satisfied the seven-year domicile requirement. Well, Ms. Zussman, we have the Arrieta case out of this court, which does impose some duty on the IJ, does it not? It does. I think Arrieta is somewhat unusual in that it states that there is a due process right to an IJ informing an alien of his apparent eligibility. I gather we're really out of sync nationally on that point. If I understand it correctly, seven circuits have gone the other way contrary to Arrieta. Is that right? That's correct. And, in fact, the Second Circuit, I think I need to clarify, in the footnote in our petition in which I addressed this, I noted that the Second Circuit agreed with this court that there is a due process concern. That was United States v. Copeland. In fact, when I went back and reread that case, I think it's more nuanced than that. Copeland recognized that, in fact, it was a procedural defect. As this court recognized in Moran Enriquez, there is an INS regulation. At the time, it was 240A11. Now it's been renumbered to 1240A11. But that INS regulation says that an immigration judge shall inform the alien of apparent eligibility for relief from removal. And what this court in Moran Enriquez held on direct review in a civil setting was that, well, the INS created that regulation. Then they've got to live by it. Well, now, can your side prevail if we simply follow Arrieta, or are you, in effect, asking us to overrule Arrieta? Arrieta, I think, is entirely distinguishable because that involves someone who was, at that time, eligible for relief from removal. Our case is unique from all of the other cases that have predated it from this court in that Mr. Lopez Velazquez was, in fact, neither eligible nor apparently eligible if you look at the law that was in effect at that time. Every other case, you had either a St. Cyr issue where they were, in fact, eligible, but the Supreme Court's interpretation of the law changed, or several instances in which the immigration judge gave affirmatively incorrect advice about the lack of eligibility. This case is unique in that it involved a claimed omission, and one in which, again, there is simply no support in the regulations, the statute, or the Constitution that an immigration judge either advise of potential, plausible, colorable claims, or of the fact that if you file an appeal for any basis whatsoever, then you may, at some point in the future, become eligible for relief. An assessment? What does the record show actually took place at the hearing, the immigration hearing in immigration court? We have only a limited partial transcript in our record of what took place. We know, and this is at ER 62 of our original excerpt of record, that the immigration judge specifically confirmed with Mr. Lopez Velazquez the date that he applied for relief under SAW, that he was, in fact, a SAW applicant, and that he attained lawful permanent resident status on December 1st of 1990. Do we know if the immigration judge had in front of him Mr. Lopez Velazquez's A file? I have nothing in the record that substantiates that. It would be in the ordinary course that the immigration judge would, in fact, have that file. And the government has never disputed that Mr. Lopez Velazquez meets all of the other eligibility criteria, that he was married to a United States citizen, had children, et cetera. It was only the disqualifier here. What does that proceeding reflect that the IJ did in order to make any kind of assessment about whether Mr. Lopez Velazquez would have been eligible for any form of relief? Again, we only have a partial transcript that was submitted by Mr. Lopez, because with the criminal context and dealing with a collateral attack, it is Mr. Lopez's burden to prove that that prior hearing was fundamentally unfair. Doesn't that, what we do have, doesn't it show that at one point the IJ asked the government lawyer, are any of these individuals available for any relief? And the government lawyer said no. Yes, that's correct. So does that suggest to you that the IJ made any kind of determination at all about whether or not he himself thought that there was any possible basis for relief? The only thing we have is an inference that by confirming the dates of Mr. Lopez Velazquez's temporary status and his permanent status, that the IJ, presumed to have knowledge of the law at the time, would have presumed that he in fact failed to meet the seven-year domicile requirement. Now, all this took place at a very, I guess it's like an arraignment kind of hearing. It's like a first appearance kind of hearing. Isn't that correct? I don't know if that's accurate. Well, the IJ was addressing multiple aliens at the same time. Isn't that correct? We know there were at least two there from the transcript. So what was this, just a first appearance kind of hearing? He was ordered, it was a notice to appear. So is it your position that at that hearing that Mr. Velazquez had to make a showing that he was eligible for relief? No, it's my position that in order to collaterally attack his prior civil removal hearing, he had to show that it was fundamentally unfair. And that's where the immigration judge is only duty-bound pursuant to the regulations to advise him of an eligible form of relief if it is apparent in the record. And here, it would have been apparent to an immigration judge, particularly in February of 1994, that Mr. Lopez was not, in fact, eligible because he failed to meet the seven-year lawful domicile requirement. Did the immigration judge have any obligation or practice to advise them of the right to appeal? And if so, how much time? Well, let me ask that. I have a follow-up question. Yes. Okay, and he did advise that the aliens who were there were all advised that they had a right to appeal. Correct. And how much time did they have to appeal? I don't know the answer to that. What I've been able to find, it looks like it's like 10 days. But he was deported two days later, wasn't he? That's correct. So what opportunity did he have, unadvised as to possible grounds, to seek any counseling from a third party, either volunteers who were advising immigrants of their legal rights at the time if there were any, or seek out counsel? Did he have any opportunity to do that? Yes. The record reflects that he was, in fact, advised of his right of appeal and that he waived that right of appeal. How did he waive it? Affirmatively? Yes. And there's been no claim here about any defect relative to his waiver of his pellet rights. Was there any process in place for an alien to get any kind of pro bono counsel at that point to, since you're saying the I.J. couldn't come up with anything that was apparent, let's suppose that a lawyer could have spotted at least a colorable claim to justify an appeal and might conclude that in the process of things that would delay enough to accrue time. So it wouldn't be the posture of the I.J. trying to advise about a strategic consequence. It would be a lawyer who would spot that and come up with, or search for anyway, plausible grounds for relief. Was there anything for the alien to avail himself of? Your Honor, the only thing I can answer is what's in the record before this Court. At ER 52, there is a checklist that shows that Mr. Lopez was advised of his right to counsel, of his right to free legal services, of his pellet rights, of his evidentiary rights, and of a reading of the charges, and that he waived his right of appeal. So from that, it appears that he was, in fact, advised of his right of free legal services. And does the record, thank you, does the record reflect that there were, in fact, lawyers available to them? The record does not reflect that, Your Honor. I see. All right. And would you know that he was pro se? Yes, Your Honor. He was an attorney. Yes. What is the? I just wanted to point out that in answer to Judge Paez's question, you said that the record shows only two people in this deportation. But if you look at ER 68, the judge says, after denying Mr. Lewis's, because he's the other one who you were referring to, I assume, after he denies Mr. Lewis's request for voluntary departure, he says, now speaking to everyone else, the Court is going, so he's obviously speaking to more than just Mr. Lopez at that point. Yes, there had to have been more than just two. I believe a more precise answer to Judge Paez's question would have been at least two. A more truthful, non-misleading answer would have been there were more than two. I don't know how many there were, but at least two, Your Honor. That would be accurate. All right. Ms. Essman, help me out here. I want to follow up on, I believe it's maybe a similar question to Judge Scanlon, but maybe it's not quite. Let's assume for purposes of this question that, in fact, the immigration judge was required to give a warning and failed to do so. I realize this is in contention here, but let's just assume we get past that point. What authority is there for dismissing the criminal charges because of that defect in the deportation proceeding? I mean, there are other possibilities. One of them was that one could go and undo the, correctly, attack the immigration proceeding. Other possibilities, this would be defense put before the jury. Where is the authority for the district court to dismiss the charges based on what we're now assuming is a defect in the charging process? Well, I guess I have a couple of answers to that. The first is that the defect is only half of the equation. We would then have to move to the issue of prejudice, and whether or not there was a reasonable probability that the outcome of the removal proceeding would have been different. Let's get you past that. Okay. Let's assume prejudice. Where is the district judge's authority to dismiss the charges because the immigration proceedings, which are final and have not been set aside, have some defect within them that now becomes apparent? Does the case, this one, does the case that Judge O'Scannon was asking about hold? United States v. Arrieta does, in fact, hold that if, I don't know if it addresses specifically the relief. What it does say is that a successful collateral attack on the prior deportation can be made out where an immigration judge fails to inform the alien of an available form of relief. There, the court looked at the fact that there was evidence of an extreme hardship. I don't believe there was any issue about eligibility or timing. In answer to your question about where is the source of a district court's authority to dismiss the indictment, I think it's a two-step process. We start with the statute itself, 1326, sub D. And that is if the alien, in this instance the defendant, is able to establish that his prior removal hearing was fundamentally unfair, then he has mounted a successful collateral attack. And under the Supreme Court's Mendoza-Lopez decision, then we would be unable as the government to sustain that element of the 1326 charge. That was count one here. We have only one count in this case. It was a single count of illegal reentry in violation of 1326. Now, Mr. Lopez was prosecuted previously in 2000 for illegal entry, and that was a two-count indictment. Ah, yes. So Mendoza-Lopez is the authority. Yes. From your perspective, what, I guess, what presents the most difficulty for the government in terms of the lower court's holdings? I mean, what are, how, you know, if you're asking the court to reverse, but how can that be done most narrowly and most broadly, and what is the most problematic part from your perspective that IJs then would have to be, they would have to know what was going to happen in the future and advise people of something that doesn't exist at the time? And so that being said, or is it, you know, what's the most problematic part of this from your perspective? I think it is the confusion that the panel's original decision, in fact, created for immigration judges. I mean, when we're talking about the repealed 212C relief, we have a discrete group of individuals that were affected by that because, of course, the law has changed. But what the panel's decision does is it imposes a somewhat nebulous obligation on immigration judges to advise aliens of potential changes that may happen in the future. And in immigration law, I think we're getting on very dangerous ground. And so immigration judges, in response to this decision, it has created a tremendous amount of confusion about what exactly their obligation is. What we are asking for is really a very simple rule, and that is one that would say that an immigration judge, his obligation pursuant to the regulation is to advise an alien of forms of relief for which he is eligible right then, that that's the standard. Where does that leave what you said earlier in your argument, that they are arguably or reasonably possible or colorably eligible at the time? I understand the difference between at the time and maybe eight months from now or three years from now, depending. But is it that they are certainly eligible for or that there's a reasonable possibility that they are presently eligible? And the standard from Lorraine Enriquez and from the regulation is that of apparent eligibility. But how is that defined? I think I'm looking at we, where we say apparent eligibility is a reasonable possibility that the alien may be eligible for relief. So that's, it's not, it's not, apparent eligibility isn't the answer because we've gone on to refine and define what that means, whether there exists a reasonable possibility that the alien may be eligible for relief. And I do, I think that there has been quite a bit of imprecise terminology used in attempting to employ this apparent eligibility standard. The word plausibility showed up in the Jimenez case. We've also seen reasonable possibility. Reasonable possibility comes from Lorraine Enriquez, which you just said. Correct. Reasonable possibility relative to the apparent eligibility standard from the regulation. Correct. I think the concern is, is that what we The plausible standard goes to the prejudice. Correct. And I think what we can do though is look to Strickland and Infective Assistance Claims, at least by analogy. That's what the Second Circuit did in Copeland. And I think there, once we look at employing a standard of reasonable probability that the outcome would have been different, and that apparent eligibility focuses upon, as the unpublished panel did in this case, upon what the immigration judge reasonably would have expected to know the law to be at the time. Here, and again, I don't think it really matters so much whether or not we're looking at Castillo Felix or Ortega de Robles, because Mr. Lopez was in fact ineligible under either formulation of the triggering date for the seven-year requirement. But if we look at, again, what was the law at the time that was presented to this immigration judge, Mr. Lopez, under any formulation of the standard, was not apparently eligible because anyone with a calendar could tell that he didn't meet the seven-year lawful domicile requirement. Well, he makes the argument that you could accrue time from the time the SAW aspect was enacted. If that were the case, then he would have accrued enough time to be eligible as of the hearing, right? If that argument was plausible. Possibly plausible, but what that argument is, is it's an argument made 13 years after the fact with the benefit of hindsight and a tremendous amount of time. I understand, but what you're saying is, maybe you aren't saying, wouldn't go this way. Let's suppose there is an immigration reform bill sitting on the President's desk awaiting signature. It hasn't been signed yet. The hearing happens in a signing ceremony a week down the road, whatever. So it's not law yet. Is this bright line you'd like us to adopt that strict, or are there shades of actually presently able in your kind of stuff? I think we start getting into way too much of a diffuse area, and it's an unworkable standard for immigration judges. The problem is, it may be for the judges, unrepresented people who, if they had a lawyer, a lawyer could take a look at this and perform the function that we're asking the IJs to. It's the D4T who is separating the consequences. You pose, I think, a much more difficult hypothetical than the situation that we have here. In February of 1994, the law in this circuit had been, and had existed for 41 years, that you measure seven years of lawful permanent resident domicile from the date that someone becomes a lawful permanent resident. 41 years of precedent is what we're asking this immigration judge to set aside. You don't think that immigration judge is capable of understanding the changes in the law that Congress adopts? Of course he's capable of understanding it. He was aware of it. The first question out the door to Mr. Lopez Velazquez was, your status was adjusted pursuant to the amnesty program. He was certainly aware of that. Well, at the time, though, that the immigration judge advised him, was he eligible for anything? No. So it occurred subsequently, correct? Correct. Ortega de Robles came out a year after this hearing. But even if, Judge Pius, even if this immigration judge had predicted Ortega de Lopez, based upon the passage of the- Well, it's not a matter of predicting. How about just raising a question? I mean, this is all taking place at one of these hearings where there's multiple defendants. It's just like in the state courts when you do arraignments with multiple defendants, and you go very quick, and that's what's going on here. The immigration judge really isn't making any meaningful determinations at this time. He relies upon the government's attorney to ask, are any of these people eligible for relief? No. End of story. That's it. But the standard that you propose- See, I think these immigration judges probably are entitled to a little more respect. I think they're quite capable of figuring out- We refer to them as experts in the law. They're knowledgeable about immigration law, far more than I am. They understand it. They understand the nuances. He knew that the amnesty program was around. Just like in the Valencia case,  But unless the record, this court has held, unless the record raises a fair probability that there is apparent eligibility under that form of relief, there is no obligation on the part of the immigration judge that is triggered by the law. Getting back to the question I asked, and this sort of ties into the conversation you're having with Judge Price, I went back and refreshed my recollection of Mendoza-Lopez. Mendoza-Lopez holds that it has to be a matter of due process, that the failure- It is quite clear that not every violation of the rules is reviewed by way of collateral attack. In a criminal proceeding, it has to be a violation of due process. Do I hear your understanding that you're arguing that this is an off-ball within Mendoza-Lopez because it might have been a good idea for the IJA to give this warning? There was no violation of due process? Absolutely. In failure to do so? It is certainly our position that there was no violation of due process here. Denial of fundamental fairness? Neither that, either. Well, same thing. Our position is that it would only be fundamentally unfair if the immigration judge either violated due process or in some way failed or affirmatively misled Mr. Lopez such that his proceeding would be fundamentally unfair and would undermine the validity of his waiver of appeal. Well, go ahead. No, no. I was going to point out three minutes, but- Well, I just want to, isn't the problem here that the government lawyer advised that he got temporary residence in October of 1987 so that everybody in the courtroom knew that he was, he'd have the seven years within a few months if he calculated it from that date? And if he had a lawyer, the lawyer would have known that he, if he appealed, the time would run and he would have the seven years. Isn't that the peculiar problem in this case? I suppose so, and trying to square this with Ahumada. Yeah. The problem is Ahumada actually had a Mendoza-Lopez violation, and we only then turned to the alien's proximity to eligibility when we looked at prejudice. Here, we don't have a Mendoza-Lopez violation. What we have is a claim that because he potentially had this colorable argument that wasn't raised but that could have been raised, that then because he was close, we can kind of mush it all together and say his proceeding was fundamentally unfair. And that's where we say this imposes an unworkable burden on immigration judges, that the standard that makes sense is the standard in the regulation, that they need to advise under the regulation of apparent eligibility as it exists at that time. You have about two minutes left. May I reserve for rebuttal? Yes, please. We'll hear from the defendants. Please, the floor. If I may, I would like to start out with the eligibility issue, and then from there go to the due process issue. With the first note that the due process issue from Mendoza-Lopez has to do with the waiver, the denial of judicial review, and the unconsidered and unintelligent waiver, that's the due process issue that's involved for Mendoza-Lopez, and that's the due process issue that is in play in this case. But in terms of eligibility, starting from the bottom and moving upward, what the immigration judge had in front of him is seen in the transcript that we have on ER-64 from the first questions to Mr. Lopez and the immigration attorney. When the judge asks, are you talking about when you got your temporary card or when you got your permanent card, Mr. Lopez says, permanent. The immigration attorney says, I believe the record reflects he was an agricultural worker. So the immigration judge and the immigration attorney had the A file in front of them. At the district court in this case, there was a hearing. He was not eligible at the time, right? Pardon? They had the file in front of him, and what they would have seen is that he, in fact, was not eligible. Eligible for? Relief. No, I believe they would have seen he was. How is that? Okay. This comes out in the hearing before the district judge. Well, just tell me. Okay. What's he just saying? Well, I'm still stuck on page 64 of the ER, which you asked us to look at, and I'm not reading it the same way you are. Okay. I would like to be elucidated as to how that wouldn't imply that the A file was in front of the judge, because that information can only come, I assume, from the A file. But if I can go on to answer your question about how he was eligible. Yeah. He was eligible because as of November the 11th, 1986, which was the date that the Immigration Reform and Control Act was passed, on that date. I'm sorry. This was a future date? No. Past date. Past. Okay. 1986. Okay. November 11th, 1986. Right. On that date, Mr. Lopez could not have been deported. From November 11th, 1986 onward. Well, but could not have been deported. You can't be deported when our – when you have an appeal and we issue a stay, or there's an automatic stay. There are lots of circumstances in which you cannot be deported, and yet you're not a lawful permanent resident. If we grant cat relief, for example, or withholding, you know, like Judge Pye, as I'm not an expert in this, but there are lots of circumstances in which somebody is not subject to immediate deportation, and yet they're not eligible for lawful permanent residency. Those are vastly different concepts. So how is it that as of that date your client was eligible? Because I believe that the provisions I'm talking about, 8 U.S.C. 1255, deal with residency. It was a way in which Congress had decided – Well, tell me. Let's look at the statute. Explain to me. There's no reason to believe. Let's look and see what it says. And I've got 1255 in front of me. Explain to me how it is that he was eligible. I mean, he either was eligible or he wasn't. I think you have to look at 1255A, right? Yes. Okay. It's a long statute. Just point to me where we're talking. I'm talking about – first of all, this is on page – it's set out on page 15. No, no. I'm looking at the statute. Just give me a section. Section 210A, lawful residence. I'm sorry. You were on 1255A. Yeah. Is that 210A or the Immigration Act? I think it's the Immigration Act, 210A. Is that the same as 1255A? Yes. Okay. So subsection? It's defined in general. Subsection? 210, subsection A, subsection 1. A gets divided into A and B at that point. And I have to apologize. I just have a quote from my brief. Okay. Why don't you tell me what's in your brief? It says – it's defined as lawful residence. So what page on your brief is it? Page 15. Of my initial brief. Not the brief for the – not the response to the petition for rehearing en banc, but in the initial brief for defendant appellee, page 15. Is this September 14, 2007 brief? Yeah. February 19, 2008. February 2008. It's a red brief. Oh, it's a red brief. Right, of course. 15. Okay. I'm so used to having you guys on the blue brief. Okay. 15. I'm with you. So what the – Okay, 210A. All right. Okay. What the law says is that – and that section is defined as lawful residence. And what it says is the attorney general shall adjust the 8 U.S.C. 1160 status of an alien to that of lawful permanent admitted for – lawfully admitted for temporary residence if the AG determines the alien meets the following requirements. And so the section is defined as lawful residence, which then ties into our application of this to the 212C relief. The law then goes on, if you look at my page 16. You remember the question. Pardon? You remember the question I asked. Yes. The question is, on the day he was standing before the IJ, was he in fact eligible for 212 relief? And you were going to show to me that he was. Yes. And I'm completely lost. Okay. So aren't you referring to the footnote 2 on page 16? That's what I was just getting to. Okay. It would be great if you could just explain it. Okay. Relief to judge him instantly. What? The one that's temporary stay? The temporary stay of exclusion or deportation. You understand that stay is not going to do it for me because there are lots of reasons people are stayed. Their deportation is stayed, even though they might not be eligible for relief. They're stayed to determine eligibility, for example. Okay. If I can get right to the point, then. Please. I'll try to do better than I have. It not only gave him relief from a stay, but it gave him the right to apply for and obtain a work permit. And the reason why it did this is it – I'm sorry. Just point to me the language so we're all together. Okay. Look, subsection capital D at the very bottom. It should be granted authorization to engage in employment in the United States. So what it says is your deportation will be stayed and you'll get a work permit. Lots of people get permits to work in the United States who are not lawful permanent residents. The people who work for embassies sometimes are. There are lots of people who come here on work visas. They're not lawful permanent residents, right? And – I mean, are we agreed? I mean, I'm not an immigration expert, so if you think I'm wrong on this, you should be straight. I'm getting to the final part. I think you're agreeing with me. No. I'm getting to the final part of the statute. But so far we're in agreement. You can have a right to work in the United States without being an LPR. Yes. Okay. I agree. Okay. We're on page 16 again. We're going to the footnote 2. We're going to the subsection D. And that describes the purpose of this stay and the purpose of the work permits. And what that says is that he is – the deportation has stayed and he has the work permits to give him the opportunity to apply for temporary and then permanent residency. I knew that. I knew that. What the problem is that I'm having, and maybe you can help me, is that 212C says lawful, unrelinquished domicile. So how do you get from page 15 of your brief, footnote 2, and everything else back to 212C and the seven years? I mean, how does it tie in? Or are you suggesting there's some parallel path? No. I am suggesting that the worrying lawful domicile had not been interpreted definitively back in 1994. And that the – You mean it hadn't been determined? It had not been defined definitively. Well, it had not. We had not yet come out with – we'd come out with Castillo Felix, that case, correct? Yes. Castillo doesn't help you. The case that you could most argue would help you is Ortega de Robles, but that was a year after your client was in front of the IJ. My suggestion on this is the principle that a court cannot decide what is not in front of it. A court cannot make rules in – I think Castillo Ruiz was in 79. In 1979, whatever rule is in – comes from Castillo Ruiz cannot be applied to the 1986 law that Congress passed. Castillo Ruiz did not interpret the Immigration and Reform Control Act. I'm sorry. Can I ask you what – Because the question I asked is, was he in fact a permanent resident one day? I'm sorry. Was he in fact eligible for this relief? And that's a question I'm still looking for an answer. If you don't want to – if you don't have a good answer, you can – that's fine. But you realize it by saying, well, there was a possibility he could have been, he might have been on the – is not – does not answer my question, which is, in fact, was he eligible for relief on the day he stood before the immigration judge? If the answer is no, that's okay. Let me go on to the next question. I believe the answer is yes. Well, let me – let me jump in with a question, if I may. What is the starting date, in your view, of your client's lawful, unrelinquished domicile? What was the start date? November the 11th, 1986, the date that the Immigration Reform and Control Act was passed by Congress. What legal authority do you have for that? Oh, sorry. Pardon? What legal authority do you have for picking that date, which Castile was the controlling law and then Ortega came after, and neither of those support your position? In the Ortega, it is the law – I believe what we're looking at is the law in front of the immigration judge. The law in front of the immigration judge doesn't just mean – I submit – doesn't just mean a published decision. The law in front of the immigration judge is the – an act of Congress. Castile Ruiz does not interpret the IRCA. The IRCA is in front of the judge. He knows that. Let me see if I can follow the train of thought. So your argument is not the same as what the panel in this case said, that he should have been allowed to accrue eight more months by an appeal. Your position is that under the regulation in existence, the immigration judge was required to advise him of this possible relief because, in your view, he was then eligible for it. Correct. So you're not really asking us to say that due process is more than what's in the regulation or anything far out about future possibilities. You just have a different view of what eligible at the time meant, it sounds like, from your argument today. That is correct. And the standard in Moran Enriquez and the standard in Arietta is whether or not in front of the immigration judge, the record in front of the judge, looking at that record, presented a inference, a reasonable inference that the alien would be eligible. A present eligibility as of that moment. Yes. Correct. Okay. And to get back to the Chief Justice's question, in the definition of seven years of unrelinquished domicile, getting to the term domicile, I'm suggesting that in front of that immigration judge, there is a inference that because IRCA is passed in 86, and it was designed to change the rules about residency for aliens, I'm suggesting that the immigration judge looked at that statute that was passed in 86. He could have seen or he should have seen that the fact that Mr. Lopez could not have been deported, the fact that he had a right to get a work permit, the fact that he had a right to apply as soon as the application period was open, the application period opened in June 1st of 87, the immigration judge knew or should have known that this person could not be deported. They had a right to be employed. He had a right to apply and stick around until he could apply for temporary and then permanent legal status. The immigration judge should have known. I want to stop you one more time just to make sure I understand, because it's not clear to me that the Ortega de Robles actually applies to the SAW workers. And so what in the statute should I look for that would suggest that the status in which he found himself would actually be covered by that prospective rule in Ortega? If I could direct Your Honor's attention to some language in Ortega de Robles. In Ortega de Robles, I think it follows up in my argument, or actually I'm paralleling the argument in that case. In that case, the court states that it is not bound by Castillo-Rios because, as I said, Castillo-Rios did not consider the 1986 law of Congress. And since it did not consider the 86 law of Congress. Well, what it says is that they didn't really contemplate amnesty, such as the IRCA program. So my question is, I understand what that says. My question is, how does all that tie in to the more specific issue here of the DAW program? Well, again, in either a footnote or in the direct part of Ortega de Robles, the court specifically mentions that Ortega de Robles was based upon 8 U.S.C. 245, which is the amnesty provision. And in the amnesty provision, there is a certain calculation for temporary residency. And the Ortega court uses that to determine domicile in 212C relief context. But Ortega You're saying that the immigration judge should have defined all of that. Well I'm just asking. No. The immigration – if I can be permitted. In Ortega de Robles, it specifically mentions the SAW provision and it specifically mentions that it is not making a ruling about SAW and that SAW may be different from amnesty. Right. That was why I asked my question. Right. And what I'm suggesting is Counsel, let's bring that back to one of the earliest statements you made, and that is to look at page ER-64, and you read part of the transcript. You didn't read all of it. You said that I believe the record reflects that he was an agricultural worker. In agricultural work, you couldn't get permanent resident status before September 1 of 1990. That was the earliest. So when the IJ made that statement, wasn't that the law at that time? I have to admit that in terms of whether or not he could get permanent resident status before September 1, I don't know the answer, but I don't think But we're dealing with a proceeding which occurred in front of an immigration judge, and the issue was whether or not the judge was deficient in some way. And when he makes that statement, because it was in the earlier part, Lopez says he claims 1987 as his eligibility, but the IJ says no, in agricultural work, you couldn't get permanent resident status before September 1 of 1990. That's the earliest. That was the government's attorney. All right. It's the government's attorney, but the point is, isn't that an accurate statement? Well, I don't know if that is an accurate statement. It's a statement of the law at that time. Obviously, you're making the argument that perhaps he should have taken into account some subsequent developments and some possibilities that he might have had an opportunity to apply for some things. But at that time in that hearing, and the judge obviously is agreeing with that, isn't that the state of the law at that time? And I do not believe that is the state of the law. I believe the state of the law was contained in the Immigration Reform and Control Act. That was the state of the law. And the provisions of IRCA was the law. And that is the law that the immigration judge should have known. And because he knew that, I'm not suggesting that the immigration judge had to define anything in the future. I'm not suggesting that he had to do anything other than know the provisions. But do you have any authority even to this date, that to select the date that you're talking about is how we count the seven years? Because it is... Is there any legal authority? You're saying that the statute says it. Do you have any cases that have interpreted it that way? No, but it is the application of Arrieta, the principle of Arrieta and Moran Enriquez, which states that if there is a... If the record shows a reasonable inference that the alien might be eligible for relief, he has to advise them. Do you have any case either before the date that the defendant was in front or that the alien was in front of the immigration? Do you have any cases before or after that support your interpretation of IRCA? No. So how would the immigration judge have a duty to tell the immigrant that, the alien that, if there's never been a case before or after? Because... Not because we're talking about it here today. That surely can't be imposed the duty. Because the law in front of the immigration judge... Well, first of all... I guess I'm asking, has anyone other than you ever taken that view of the law? I don't think anybody other than me has taken a view of the way Arrieta and the decisions with that framework. Nobody else has applied it to Saw. De Robles applies my reasoning to the 245 amnesty. De Robles applies it to 245 amnesty. I'm taking the same reasoning from De Robles and applying it to Saw. Well, let's just take a different situation. Let's say your client weren't a Saw recipient but were under this amnesty program and on the day that he went in front of the IJ, we hadn't decided or taken De Robles. So would the IJ have had an obligation to advise him that he might be eligible for relief as an amnesty recipient? No. But now you're saying that because of particular De Robles could be interpreted in the same way as Saw that he did have such an obligation. So that does confuse me. Well, because in the amnesty provisions quoted in De Robles, they mention that to be eligible for the amnesty, you had to have a certain period of unlawful residency and that you can apply for amnesty during the period or after your period of unlawful residency and that the time in De Robles starts from the period of the application for temporary. In Saw, the provisions of Saw, as I said, specifically create an ability from the very moment that the law is enacted. They create the ability of the alien, if he is apprehended, one, to stay deportation, two, to get a work permit, three, to apply for temporary and permanent residency. Counsel, it seems to me that you really, although in this part of the argument, you said that you're just taking or taking De Robles' reasoning and applying it to a different statute. But in that case, the time of residency or domicile was measured from the date of the application, not from the date of enactment of the statute. And if we were to use that identical reasoning, your client would not have achieved eligibility as of the date he appeared in front of the immigration judge. So are you wanting us to apply it or take it to De Robles, or do you want us to go back and say, no, it's always for every alien going to be the date of enactment? No. It depends. I'm suggesting the Court use the reasoning of Ortega De Robles and apply it to SAW. Okay. Let's take your – I understand your argument that you want to – you have a peculiar – peculiar provisions of SAW grant different relief. But in all of our cases in which we've counted temporary status, we've done so because that we've indicated that the – that evidence is an intent to acquire permanent status. How do you – how do you – using that reasoning, how can you argue then that the enactment of a statute alone creates the intent on the part of your client? Well, I think that's your difficulty. If I – I understand. I took a second to follow. The intent was in the A file. One, he had a whole bunch of people submit letters, because in order to qualify for SAW, you have to have – Right. But he didn't apply, actually, for temporary status until some time later. And generally we measure from that because that – in the cases that have applied, counted temporary status toward accrual of time for permanent status is that, you know, that evidence is an intent to stay here permanently. The law – Your argument is that the statute alone satisfies the intent requirement, and I – And if I can answer that. If I understand your argument. The law did not allow him to apply until six months after the law was passed. So November the 6th of 86, the law was passed. The law said you cannot apply for six months, and he didn't apply until after that six-month period. But the law also required him to submit letters of proof of his employment in the agricultural service, and he did that. So by having – he went up to Portland. He had all these people submit letters on his behalf, showing that he had been here since like 85 or before, and he'd worked all these hours. The fact that he had gone to Portland, submitted these letters to show that he had been working in this country for the previous 12 months, and that he had over 90-man hours of labor, I think that shows an intent to – So your argument is that his manifestation of intent should accrue from the time he submits the letters. Well – And when is that? I think it accrues because, one, his letters show his intent, and the statute – Right. But what's the date of the letter? I don't have it in front of me. It's not in here. Okay. But it had to have, you know – it had to have been – well, you know, I don't – Were the letters submitted with the application? There's no indication in the record, I don't believe. At the hearing before the district court – Let me ask you this. For you to – you know, the three-judge panel said,  What I'm suggesting is what I was not articulate enough before, is that before the immigration judge, the immigration judge, looking at the law at that time in 1994, which was IRCA, had to have seen that there is a – there's an inference that this alien could be a threat to the United States. And that he can make a case – just an inference, a reasonable inference, a reasonable possibility that he can make an argument that he had the seven years. You only need – you need more than an argument. I mean, we've got 11 people up here who – well, maybe everyone else has figured it out. But I haven't completely crystallized the statutes yet. So, I mean, my question is – you know, he doesn't have to show absolute that he's entitled to it for sure. But if you impose some standard on the immigration judge, doesn't the immigration judge look at the existing law, which in the Ninth Circuit at that time was this Castillo case? Nobody had said it didn't apply in this kind of a situation. How – what standard would you impose as to how certain his relief needs to be or not be? For the immigration judge in 1994, who does have the Castillo-Ruiz case in front of him, but he also has IRCA in front of him. And he knows – And that helps him about as much as it helps us. But he knows that IRCA changes legal residence. And it is a law about legal residence. And immigration judges are smart. And he should know that Castillo-Ruiz does not govern a new law about residence. And he should see that there is a reasonable argument. That's all. Just a reasonable argument. You know, you promised – you're about to run out of time to talk about prejudice. We've spent taking up all of your time with questions, trying to sort out what some of us still don't quite fully understand about the statute. But why don't you talk to us prejudice? Let's assume that the IJ was, in fact, required to give this warning.  And since this is not like that Supreme Court case with the hyphenated name, Mendoza-Lopez – they all have hyphenated names. The – how to keep the name straight. Mendoza-Lopez. There the question was, was he given an observation of due process because he didn't make a knowing decision about the appeal. Now, in this case, this has nothing to do with appeal. And how is it a constitution? How is it due process violation and then prejudice? Assuming, in fact, this warning should have been given. Let me try to – Can I ask you a question in a slightly different way? Just re-ask it, because I've been trying to ask this question the whole half hour. I haven't been able to get into it. But what would – okay. The argument would go that if he had been advised of the reasonable possibility of Chief 12 soon to leave, he would not have waived his notice of appeal. He wouldn't – would not have waived his appeal. Is that what you're trying – is that the argument? Well, my question is, what would be his grounds for appeal? Okay. All of – and the answer to your question first is no. That's not my argument, because I haven't gotten there yet. But the – all of my arguments so far – and I will elucidate that in a second. All my arguments so far is just whether or not the immigration judge had the duty to inform under those standards based on the law and the facts in front of him. Now, here is – and this is a Mendoza-Lopez case. So you've got the alien in front of the immigration judge, and the alien is not advised of any potential relief. The alien somehow then waives – waives his right to appeal. When he waives that right to an appeal, he's then ordered deported. If, in fact, he was – if, in fact, the I.J. should have advised him of relief, then the Supreme Court in Mendoza-Lopez says that that waiver of appeal is unconsidered and unintelligent. So the waiver of appeal is unconsidered and unintelligent. That's fine if he's simply going to try to reopen the – No, I mean, Mendoza-Lopez was an actual warning about taking the appeal. And they said it's a violation of the deposit because they didn't make a knowing decision about the appeal. But this has nothing to do with taking the appeal. This is a warning about collateral relief. And I think this is the same question that Judge Wardle is asking you is let's say he had been given this warning. What does that have to do with the decision to appeal? It doesn't give him grounds for appeal. It doesn't make it more likely he'll win an appeal. It doesn't tell him that there is – that any relief he gets on appeal will help him with this process. All it would do is drag out the time, right? No. But that's not what's happening here. What's happening here is making the assumption that we have a waiver that is unintelligent, unconsidered. Now, the Federal Government wants to take the result of a hearing in which the waiver of appeal – and this is denial of judicial review. When you have an unintelligent waiver of appeal, that is a denial of judicial review. So the government wants to take this result. And this is directly out of the language of Mendoza-Lopez. You know, I understand what you're trying to say, but explain to me how if they – if you're not told about the right to appeal, then I can see where you might say it's a violation of due process that you have the right to appeal, and so you can't make a knowing decision about it. But this warning doesn't have anything to do with the right to appeal. How is this then a violation of due process? Okay. In – I believe in Mendoza-Lopez, you have the same situation where the alien was not – the alien was not properly advised of his right for relief, and he didn't understand what was going on, and he waived an appeal in Mendoza-Lopez. That waiver, the Supreme Court found, was unconsidered. And the due process violation was using the result – and this is – see, there's a difference between – the due process violation is using the result of an immigration hearing which deprives the alien of judicial review and using that result in a criminal proceeding as conclusive proof of an element of the offense. I don't think that's what the Supreme Court said. The Supreme Court said this in the hearing itself. The process – the administrative process was unfair because he was not – he was – he made a waiver without having information that enabled him to make a knowing and tolerable waiver. That's what Justice Marshall said in that case. I mean, you're recasting it, but that's not what the Supreme Court said. With all due respect, I believe what Judge Marshall said was that when judicial review is denied – Look at page – look at 481 U.S. page 840. It says, because the waivers of the right to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding. It has nothing to do with what happens in criminal cases, it says the denial of due process happened in the immigration proceeding. I'm at a slight disadvantage. But I believe also, certainly within the same framework, the Court goes on to say, either before that or after that, that – and I believe this is the crux of their decision – is that when the results – and Justice Marshall mentions this at least twice – when the results of an administrative hearing are used to conclusively prove an element of a criminal offense, that if judicial review was denied in the administrative hearing, at least judicial review has to be granted in the court which is trying the criminal offense. Thank you. I think you have a minute or so for rebuttal. It was a minimum of 42 seconds. I have just one brief point of clarification about Ortega de Robles. In February of 1994, the BIA had in fact rejected the argument raised by Ortega de Robles in May of 1993. So an immigration judge charged with knowledge of the law would have known that the BIA had rejected the argument that any date other than the lawful permanent resident date was operative for purposes of determining a seven-year domicile requirement. In closing, I just want to urge the Court to use this case as an opportunity to clarify the law that applies to immigration judges. The language from this Court's cases has focused upon eligibility as it existed at the time that the alien appeared before the immigration judge, and that's the standard I think is appropriate here. Thank you. Thank you. Case is argued with sentence submitted. We'll adjourn.
judges: Hearing Panel: Strom, Pregerson, Reinhardt en Banc Panel: Kozinski, Schroeder, Pregerson, O'scannlain, Thomas, Graber, McKeown, Wardlaw,fisher,gould, Paez, Berzon,callahan